Mr. Fetter. Mr. Chief Justice, and may it please the Court, the North Carolina Court of Appeals asserted jurisdiction over Petitioners in this case on claims that arose from a bus accident in France that was unrelated to any North Carolina contacts. Although the Petitioners are located overseas and do not contact the public,  they do not conduct any business in North Carolina, the Court held that North Carolina had general jurisdiction over these defendants based solely on the sale in North Carolina of a small fraction of their products. Under this Court's cases, the mere sale of a defendant's products in a State does not permit the State to reach out to assert judicial power over all of that defendant's worldwide conduct. If that were permissible, every significant seller of products would be subject to suit everywhere on any claim arising anywhere. Ginsburg. There's one piece of this I don't quite comprehend. You are – there's no contest that there is jurisdiction over the parent, right? Yes, Your Honor. The parent company consented to jurisdiction in North Carolina. It's appointed an agent for service of process there. So it's based on consent? Yes. They also have other business the parent does conduct in North Carolina, but there is no objection to jurisdiction over the parent here. This case solely concerns the Petitioners who are corporations from Turkey, France and Luxembourg. Do you think there is general jurisdiction over the parent if the consent were not in the picture, is there? Does general jurisdiction go beyond State of incorporation, principal place of business? I think that that is a hard question, Your Honor. The short answer is I think the answer is no, but I think that that is probably a close case, again, putting aside the consent. But I do think that general jurisdiction is about suing a company in general, at least in the case of corporations, is about suing the corporation essentially where it's located or at home. It's always fair to bring a suit against the corporation there. I think that once you get beyond that, which is a situation that would be analogous to a State's power over a citizen or a resident of the State, I think you run into great difficulty finding a basis for the State to assert authority over claims completely unrelated to any business that or any contacts that the corporation has with the State. That said, it wasn't contested here, and there is a consent to service of process which may or may not create general jurisdiction. There is a disagreement in the lower courts on that, but none of that is contested in this case. And without having to get to that particular question of whether, in fact, it's limited to whether general jurisdiction is limited to a place of incorporation or principal place of business, first of all, there is much more directly controlling authority in this case. The most directly relevant cases are Helicopteros and Consolidated Textile v. General Jurisdiction v. Gregory, working in tandem, in Helicopteros, which was this Court's last corporate general jurisdiction case. The Court said that there was no general jurisdiction based on $4 million in purchases in the State and some other contacts. And the key is that, on that point, is that the Court held that mere purchases could not provide the basis for general jurisdiction because the pre-international shoot decision in Rosenberg was controlling on that point. Kennedy, this is preliminary, and it just goes back to Justice Ginsburg's question. I suppose you could help me out. I assume that there is general jurisdiction over the parent company, then under Respondent v. Superior, it would be liable in North Carolina for all the acts of its agents. I think that's a fair assumption. Then why isn't it automatically liable for all the acts of its subsidiaries?  Does that get into what, in the Federal practice, would be necessary parties? Well, Your Honor, I think that really what it gets into is the difference between a subsidiary and an agent, because a subsidiary is not automatically acting as the agent of the parent company in a way where you'd get Respondent v. Superior. And I think that part of what's going on in this case is that when this does go back to North Carolina for trial or for litigation against the parent company, I think that under North Carolina or whatever States where Nations Vail-Piercing or agency standards the North Carolina courts will apply, the plaintiffs will have great difficulty, actually, with a substantive case against the parent company because you would actually have to show involvement in the actions that actually the claim arose out of here. The mere general control that's inherent in the parent-subsidiary relationship is not going to create liability. And here, important to remember, we're talking about a tire manufactured in Turkey, accident in France, which Goodyear Tire and Rubber Company, now this is outside the record, as I understand it, did not have any direct connection with, again, not relevant to the jurisdictional question here, but I've, just for sort of setting  Ginsburg-Miller You are met with an argument that it's all one wall of wax. Parent and sub, they merge, it's one enterprise. And so if the subs do something, anyplace, the parent is, it's all part of one thing. So I think that was the principal argument made by the Respondent. Yes, Your Honor. And I would say, again, when it comes to liability in Goodyear Tire and Rubber, they'll be free to make that argument. That argument is not properly presented here. It was never made below. It was never, it was not made in the brief in opposition to cert. So any argument for ignoring corporate distinctions or an enterprise theory, none of that was made and, therefore, has been waived. I think that, secondly, as we indicated in our report, we have resolved a whole lot if we leave that question open, have we? You want us to write an opinion that says, unless you, unless you ignore the, the separate corporate existence of the subsidiary, parenthesis, a question on which we express no opinion, close parenthesis, there can be no jurisdiction in cases like this. Is that the kind of an opinion that the world is waiting for? Well, Your Honor, I think that actually in, if the Court were to write that, it would be left with the important general jurisdiction question that the corporate law decided incorrectly, and incorrectly in a few ways. I think that, in fact, there would be several ways for this Court to approach it, all of which would actually help to clear up the law in this area. I think that even if one gets past the waiver point, and the reason the Court shouldn't get past the waiver point is, among other things, because it wasn't raised, we, of course, had no opportunity to put in evidence that, in fact, these corporations are run separately, independent decision-making, observation of corporate form, and all the other things that would normally go into it. If you want to reach it, first of all, there's even, under the standards articulated in the Respondent's brief, there's nothing in the record to support it. And, of course, there's nothing in the record to support it. Scalia's point is that there is no special basis for ignoring the separate incorporation. Of course, we should not get into questions of whether, in fact, the subsidiary was a sham, that there was control, all of that. But the simple question of whether, when you have a totally owned subsidiary, its actions are your actions. That, I think, the Court doesn't have to reach that. You certainly do have to reach that, Your Honor. The Court has reached it and decided it before, and has said that the mere parent-subsidiary relationship does not create attribution one to the other. And there are many cases that are most recently in Keaton in which the Court cited some of its older cases for that very proposition. And I think that in another way to look at it is, even if you wanted to treat the sales in North Carolina as if they were made there directly by these Petitioners, in other words, even if you, assuming arguendo, that you could attribute those sales directly to the Petitioners and not, as the Court below found, treat them as not having been caused by them, that does not come close to satisfying what is required for general jurisdiction. And in particular, and going back to Helicopteros and Gregory, just as the Rosenberg case was binding in Helicopteros on the point that mere purchases are not enough for general jurisdiction, here, Consolidated Textile v. Gregory is binding on the flip side of that, which is that mere sales in the State are not enough for general jurisdiction. Even if Gregory weren't binding, I think that you could look at Helicopteros and say there is no real basis for a distinction between mere purchases and mere sales, but in fact, there is a case directly on point, and as well as a lot of case law from the time of Gregory, more generally requiring much more sales to be made for a substantial, a substantial physical presence in the State. In terms of, I think no personal jurisdiction argument should go by without talking about international shoe, and if you look at just the international shoe line of cases, even aside from this issue of Gregory being binding, the decision below is equally if not more untenable. International shoe itself recognizes in sort of carving out an area for what eventually came to be called general jurisdiction, it recognizes the extraordinary nature of the State power that we are talking about when we talk about general jurisdiction, which is this power to reach out and assert State power over things that, by hypothesis, have no relationship to contacts with the State. International shoe uses the language saying that you need continuous corporate operations within the State, and says that these continuous corporate operations have to be so substantial and of such a nature as to justify this jurisdiction over conduct that is entirely unconnected to the State. The one case where the Court has upheld general jurisdiction since international shoe over corporation is Perkins, which was a case that involved the corporation's principal place of business. And in Helicopteros, following Perkins, when the Court articulated the standards there, the Court said that we're looking to see whether there are contacts of the sort that we found to exist in Perkins. So perkins is a kind of unusual case because it was a company that, at the time, was doing business only in Ohio. It was a Philippine mining company, and it was World War II, so the mines couldn't be run. So to the extent that the corporation was existing anywhere, it was in Ohio. That's right, Your Honor. And I guess what I would say about that is that it's unusual — those are unusual facts, but not unusual in terms of what is required to be able to assert general jurisdiction. The Court in Keaton later described Perkins as essentially involving the corporation's principal place of business, and I think that's right, because in order for the State to be able to assert jurisdiction over things unrelated to the State, you need that type of relationship equivalent to a citizen or resident that gives the State authority over the corporation's actions worldwide, and not just — because this goes far beyond specific jurisdiction where the State has a manifest interest in an accident or a claim that arose in the State or connected to the State. Helicopteros, just to circle back on that point, does say we're looking for contacts of the sort found to exist in Perkins, and as we said, said that even $4 million in purchases were not enough. I think that all of those cases help to make it clear why the mere sales here are not enough. And if there are no further questions, I would like to reserve the remainder of my time for rebuttal. Roberts Thank you, counsel. Mr. Horwich. Horwich, Mr. Chief Justice, and may it please the Court. The North Carolina State court was wrong to assert general personal jurisdiction over Petitioners, extending potentially to any claim against them rising out of any conduct of theirs anywhere in the world. And there are several ways to see why that's wrong. Even if the Court were to accept the proposition that such contacts with North Carolina as there are in the record should be attributed to Petitioners, those contacts still don't rise to the level of what this Court has demanded in terms of continuous and systematic contacts. And even setting those more precedential tests aside, I think there's also a the result of the North Carolina court's decision is that the jurisdictional consequences here would be quite disproportionate to the contacts that that on which it would be based. So if I can, I guess, turn for a moment to the continuous and systematic contacts proposition, which this Court has certainly not elaborated in its case law, but I think it it would be I think it's useful to speak of what exactly the Court was trying to get at. And what we think the Court was trying to get at, particularly by, as my friend referred to, particularly by its reference in Helicopteros to Perkins as being sort of a benchmark for what continuous and systematic contacts are, I think it requires seeing an active volitional undertaking by the defendant. It can't be based on the contact, conduct of third parties. Obviously, the continuous concept of existing without interruption. And with respect to systematic, we think that that means there needs to be a plurality of contacts. They have to be of different kinds or qualities in the sense of perhaps employment as well as contractual, as well as regulatory, as well as property, as well as sales or purchases. And that those contacts together have to have some interrelationship that results in something that might be thought of as more than the sum of their parts. Ginsburg. And suppose it's just a corporation, it's registered to do business in North Carolina, and in connection with that registration it says, I appoint so-and-so my agent to receive process for any and all claims. Well, as Mr. Fetter referred to, there is a division in the lower courts on whether that sort of a consent is effective to permit the State general jurisdiction over the consenting party. That — but the Court has, I think, been fairly clear in setting notions of formal consent to one side when considering contacts-based cases. And so, in part, this case, therefore, doesn't present that question, and we don't have a position as the government on that today with respect to whether that's effective. But it certainly is the case that simply because one entity in a Goodyear family of related corporations has consented, that somehow that consent should extend to the entire enterprise. And if I can maybe take a minute to talk about where we think the Respondent's view of this enterprise jurisdiction goes wrong, because we touched on it only briefly in our brief, which was, of course, filed before theirs. When a court confronts a set of a corporate family, if you will, there seem to be two principles that can be usefully applied in determining the jurisdictional consequences of that relationship. One is the alter ego concept, which certainly doesn't seem to be supported on anything in the record here in the sense that there's no sound suggestion in the record that the European entities were somehow a sham, that they didn't have any separate existence, they were undercapitalized, or any of the other indicia that you would see. And so to your point, Justice Scalia, I think it is certainly something the Court could say, that the record here is no basis for that kind of a decision to disregard the corporate separateness. Then the other concept is the agency concept, and I think that may be what Respondent's are placing somewhat greater reliance on. And we certainly have the view that an agent acting on behalf of a principal within the scope of its agency can take actions that create contacts with a jurisdiction that are, by virtue of the agency relationship, attributable back to the principal. But there are two important things to realize that that proposition is somewhat modest in that, first of all, simply because a parent owns a subsidiary does not mean the subsidiary is the parent's agent. Plenty of parents simply own subsidiaries as property or for various business reasons. It doesn't mean the subsidiary is automatically always acting as the agent of the parent for all purposes or any at all. And the second thing to be cautious about in applying the agency principle is that the agency relationship only runs one way. That is to say, the agent can do something that creates a contact on behalf of the principal. But that's not to say that everything the principal does in its independent activities says anything about what contacts its agent has. That's exactly backwards. And so here, the allegation actually in the complaint is that the European companies are the agents of the parent, of the Goodyear U.S. entity. That's paragraph 16 of the complaint at page 112 of the joint appendix. So it might be — there might be an argument that something that the European subsidiaries have done, say, in Turkey, is something that could be chargeable to the U.S. parent in a case where it was relevant what the parent's relationship with Turkey was. But what Respondents are asking for here, in effect, turns that completely around and suggests implicitly that the parent of the Goodyear organization in the United States was somehow doing the bidding acting at the direction in control of the European companies as principals. Kagan. Kagan. Mr. Gorwitch, could I ask you a different kind of question? And I apologize in advance for taking you a little bit far afield. But I wanted to ask you about a particular sentence in your brief that seems to have some relevance to not the general jurisdiction question, but some relevance to specific jurisdiction. So this is on page 20. You say, If mere purposeful availment of commercial opportunities in a particular State, which is, of course, the test for specific jurisdiction, if that purposeful availment were sufficient to subject an enterprise to the general jurisdiction of that State's courts, a corporation that sold its goods to an independent distributor, intending that they be resold in all 50 States, could potentially be brought to judgment in any State on any claim against it. So I take that, I understand that to read, that you think that it is purposeful availment that subjects a company to specific jurisdiction, not to general jurisdiction, but to specific jurisdiction, if a corporation sold its goods to an independent distributor intending that they be resold in all 50 States. Am I reading that correctly? No. I don't believe so in the sense that I think we were sort of assuming arguendo a concept of purposeful availment that would be willing to attribute those contacts for purposes of a specific jurisdiction analysis. I don't know if that helps with the answer. Kagan. No, I was hoping that the answer would be yes, actually. There was at least one other person in the courtroom who was hoping that, too. I was wondering why is your interest in this case so much greater than it would be in the other case? And this, I've been wondering that at the outset. And this sentence that Justice Kagan points out brings that into full focus. Well, Justice Kennedy, let me put it this way. The difference in our interest in the two cases is, at bottom, just a difference in magnitude, but we think it's a fairly significant difference in magnitude in the sense that the jurisdictional consequences of an assertion of general jurisdiction are that, with that one determination, it is the case that that defendant could potentially be brought to judgment in a forum for all of the – for claims arising from any of its conduct anywhere in the world. And specific jurisdiction, by construction, by its very nature, is only going to be a determination, whatever the contours of the specific rules that are used, it's going to never be more than a determination that jurisdiction in a claim, considering the relationship between the defendant, the forum, and the particular litigation given, gives rise to jurisdiction. Breyer. Breyer. I mean, you've heard the argument in the last case. I mean, it seemed that that potentially can subject the smallest manufacturer to liability throughout the world because it uses the Internet. And that – I don't know what the foreign policy – you've heard treaties discussed, et cetera. Do you want to say anything? And briefly. Yes, Mr. Chief Justice. The brief answer is that the Internet questions, in particular, are so complicated and, indeed, so potentially far-reaching that in the case that presented them, our interests might very well be different. Thank you. Saved by the bell. Ms. Petty. Mr. Chief Justice, and may it please the Court. The Goodyear Petitioners asked this Court to assist them in avoiding the jurisdiction of the North Carolina courts. This Court should decline for two reasons. First, there's nothing new here. Ample evidence supports North Carolina's exercise of general jurisdiction over the Petitioners under very well-established general jurisdiction and due process principles. And second – I think there's something very new about this, because general jurisdiction is all-purpose jurisdiction, and for a corporation, it's sort of like a residence for an individual. I think Mr. Federer was making that point. What's troubling here is that the North Carolina court seems to be blending the two together, specific jurisdiction based on the claim arising in the forum, and general jurisdiction, where the claim has nothing to do with the forum, and its assertion of jurisdiction over any and all claims. And I do not know of any case post-international shooting. The only thing that we have is Perkins against Bengay. Is there any case in which this Court has sanctioned the assertion of general jurisdiction based on some tires, some products coming into the State, not the product that caused the injury abroad? I don't know any case. Your Honor, if that's the characterization of the case and that's all you had, then there wouldn't be a case. Our argument here, and I think what the evidence in this case bears out, is that is not the case here. The characterization of the case by both the government and by Petitioners is that there are simply mere sales here and they ignore how the sales occurred. Our focus is on how the sales occurred. And I think Justice Scalia made a correct distinction that what we're doing here is not talking about attribution, that sort of thing, and simply saying that because someone down the line sold them without any other discussion, there's general jurisdiction. That's not correct. Well, then you don't defend the reasoning of the State supreme court? I think that the State supreme court did a lot of things right. But as we say in the brief, we think that they took a detour in using inappropriate stream of commerce language that isn't there. It's not that they didn't have help doing it. For example, the Petitioners have changed their tune here. They talked routinely about purposeful availment in their briefs to the court of appeals and to the supreme court, for example, page 327 of their brief requests that they find purposeful availment here. So the court had a lot of help. But that part of the opinion we don't really think is appropriate, nor is it necessary. The point that I'm making about there being nothing new is that there is ample evidence in this case to apply to the general jurisdiction principles that were used in Perkins and used in Hall and that can cause this Court to reach the correct result. As the Court is well aware, this Court can affirm on any basis supported in the record, and we believe that there is a basis in well-established rules supported in the record, whether it agrees with the court of appeals decision or not. It's not bound by that analysis, nor are we. I'd like to address the question of waiver because it's come up. I think that the Solicitor General has correctly, I think. You have me in suspense. Tell me why it is that the general principles of jurisdiction do apply here, and then we can get to waiver. Don't leave me dangling like that. Your Honor, as far back as Burger King, this Court recognized that commercial activities, when they are conducted on behalf of an out-of-state party, can sometimes be attributed. Even the Solicitor General agrees that there is a different jurisdictional analysis that may apply over and above something like Cannon or Russ v. Savchuk if there are case-specific interactions between particular affiliated corporations as you have here. Scalia's case-specific is not talking about general jurisdiction. It's talking about specific jurisdiction. No, no, but what they're talking about are that there are evidentiary case-specific interactions between the party that would lead to the conclusion of general jurisdiction and the subjecting to them to suit on a dispute-blind, dispute-blind jurisdiction. In addition, this Court has used in a variety of other areas a unitary business principle for local taxation in Mobile, and even as far back as 15 years ago, the Hague Convention, our trade partners that are complained of here, talked about the fact that using attributing contacts or counting contacts that were based on conduct performed by others was appropriate and was not really a sticking point and that they were perfectly content to leave that to other cases. Scalia's case-specific is not talking about general jurisdiction. It's talking about specific jurisdiction. In addition, this Court has used in a variety of other areas a unitary business  And, frankly, we'll use the Solicitor General's definition of a system from their brief at page 23, where they talked about conduct that forms a system, an aggregation of objects united by some sort of regular activity or interdependence. Using their definition, I think you asked the question, is a defendant part of a continuous business system or enterprise that conducts general business activities in the forum? And the first question you ask is, is it a single system or an enterprise? This Court has said in Mobile Oil that a unitary business is identified by functions. Ginsburg-Carr, you haven't, don't have anything in the record about this being a unitary business, unless you're trying to present some sweeping, piercing the corporate veil theory. There is nothing here that says that these aren't corporations that are acting separately, that have their own officers, have their own employees, keep their own books. There's nothing to show that it's all part of one enterprise. I disagree with that, Your Honor. Under the sort of traditional measures that the Court has used in terms of ownership, et cetera, I don't think there is anything. But even the Solicitor General concedes, page 27 of their brief, that the court of appeals effectively treated the parent and subsidiary corporations as an undifferentiated entity for distribution of the Petitioner's products. And that was our position below. And I think if you look at the question. Scalia, the question isn't whether they did that. The question is whether it was right to do that. I mean, you don't make your point by saying that the court of appeals made a mistake. No, no. But I think what, at least as I understood her question, and I may have misunderstood her question, was is there anything in the record where they had done that. I think the evidence in the record is part and parcel of the fact findings that the existence of a highly integrated supply and distribution system in the — that operates in the State, the number of tires, for example, that Petitioner's manufactured in North Carolina was determined solely by orders that were solicited in North Carolina by Goodyear and forecasts made by Goodyear based on data that they gathered there. On the distribution side, the testimony from Mr. Kramer was that they don't send any distribution. It was an internal distribution system. Scalia, I mean, those arrangements could exist with a lot of distributors. You don't want to ship a distributor stuff that the distributor is not going to be using. I mean, my goodness, the fact that you coordinate with your distributor how much of your product you're going to ship to him, it doesn't really show that you're a unitary business with your distributor. Your Honor, I think this goes way beyond coordination. For example, Mr. Kramer testifies that, quote, their job is just to be given a forecast or a ticket and then they just build widgets. That's all they do. They were complete — their solicitation and their production was solely based on the control and the requests from the parent. The requests, as he testified, quote, emanate from the requests that Goodyear would make. And the production and supply system was the same for all of them. On the distribution side, the testimony was even more, I think, was even more limited in that he said the plant in Turkey doesn't control any distribution. They wouldn't send anything into the United States without the approval and sanction of the parent, and anything else, quote, just doesn't happen. So this was a closed system. It was dominated by Goodyear, the Goodyear parent, and there wasn't a question of coordination. It was they didn't produce unless the parent told them to, they sent it where the parent said they should send it to, and when it got to the United States, the testimony is, is that the parent controlled it at that point. Ginsburg. But the it wasn't the product that caused the injury here. As I understand the case, the tire that allegedly caused this bus to turn over was designed for the European and Asian market, not U.S. market. The Goodyear regional RHS tire that was on the bus and that failed was not generally designed for the U.S. market, although it was brought over here under special circumstances. The tires we're talking about are of three kinds. There are passenger and bus tires that you would ordinarily see that would be sold individually. Second, a second category are tires that were sold as original equipment on cars and buses. And third, and the predominant type that were sent to the United States were specialty tires for so-called lowboy trailers, which are horse trailers, boat trailers, of which there are many in North Carolina. Ginsburg. But why did why should Mr. Fetter brought up the helicopter and he said in that case it was purchases and in this case it's sales. And in the purchaser case, certainly we said no, there's no general jurisdiction. Why should it be any different? I think the distinction between Hall and Perkins is not so much purchases and sales, it's which contacts do you count. And the language that is sort of forgotten in Hall is the language they talk about you needed to have the same general business contacts that you had in Perkins. I think the difference is, is that purchases are sort of a one-shot deal. They may be supplied. They're more regular, but the core business is selling, is selling items. And so sales count more than purchases. I don't know whether that's reasonable. Ginsburg. In Perkins, it was the home of the corporation. There was no other at the time, because their permanent home was not functioning because of the war. So there was only one place. You're right. I think the facts of that case are, is that one officer of the corporation came home and he was maintaining. He was the president of the corporation. He was the president of the corporation. Whatever business it was doing, it was doing from that office in Ohio. Right. And the Court characterized that. I think there's a difference between what the Court did in Perkins and how it was described in Keaton. That's the language that the Petitioners have used. But the language that the Court used in Perkins was that the decision was based on the supervisory activities, not the fact that it was the principal place of business, but the fact that the supervision over, for example, the renovation of the factory after the war took place in the forum. May I ask you about the ramifications of your theory that there's general jurisdiction in North Carolina over these three subsidiaries? Suppose that one of the children on that bus was a Canadian citizen who was going home to Canada, and has the idea that juries in North Carolina are more liberal than in France. Well, there wouldn't be any jury in France, but so could the Canadian come and sue because there's general jurisdiction in the United States? I think it would depend upon a lot of factors, Your Honor. Are you assuming that there is or it's established that there's general jurisdiction there, or are we in the same pattern? No, you're talking about Goodyear and these three subsidiaries. You say there's general jurisdiction in North Carolina. Those companies can be sued on any and all claims. So my question is, could anyone on that bus that turned over in Paris come to North Carolina to bring the wrongful death or whatever, sue? I think in theory they could. I think in practice the case would never stay there because of the controls that we talked about on forum shopping, about particularly forum nonconvenience. One of the suggestions, for example, that we made is one may want to consider for due process purposes the residence of the plaintiff. Is it fair, for example, to have a case in North Carolina where the plaintiff doesn't live in North Carolina as they do here, but lives in Canada? So that's one limitation. And as this Court said in the Sinecam case, you can look at the forum nonconvenience issue before you look at the jurisdiction issue. Kennedy, that's an odd way to think about general jurisdiction. General jurisdiction is principally status, your residence, the principal place of business, the place of incorporation. And these factors that you're mentioning are, in fact, some of the factors you mentioned in the brief are quite different than that. Your Honor, I think if the limitation, if the Court's view is basically the Petitioner's, that you are limited to principal place of business, state of incorporation, and physical presence, which we don't think is a state of the law, and frankly, if it were the state of the law, then we would have a Hague Convention now and it wouldn't have taken 20 years to negotiate. If that's the position that the Court is taking, then I don't think that the Court would have said, you know, this case represents something different. I think the state of the law is that, or at least the professed state of the law, is that it is based on continuous and systematic contacts. Sotomayor, let's assume that you're right, that on some level, that it's not just the place of incorporation or the principal place of business, that it could be created by something more. The only something more here is Goodyear, USA. So your adversary is right that what you're asking us to do is sort of a reverse principal agent. You're saying that the subsidiary has used the principal, its owner, as its agent. That's really the core problem with your argument, isn't it? Because without the Goodyear, USA activities, there's no other activity by the foreign corporations. Your Honor, I think what we're talking about is not so much attribution as more of a merger or a joint activity. What we're saying is that there is a system by the solicitor general's own definition, the kind of interdependent relationship that the solicitor general. Sotomayor, do any of these companies, the Goodyear Turkey Company, the others, do any of them sell the tires directly to Goodyear, USA, for distribution to the United States? As I understand it, these tires were sold to other entities, foreign entities, who then sold them to the U.S.A. That's not borne out by the record, that it was represented by the Petitioners. We put a footnote in the brief that the citations that they give do not bear that out. There's nothing in the record, and we've read it twice since then, that indicates that they were sold, and they have backed off on that in their reply brief. Instead, the – there were three methods of distribution. They're discussed at page 265 of the brief. Items were either sent directly from the factory to the buyers that were identified by Goodyear. They were either then sent to Goodyear that took ownership or took possession of them. When they arrived in the United States, they were put in warehouses and sold outside of those. But there were several distribution methods. Scalia, page 265 of the brief? I didn't read that many pages. No, no, excuse me, 265 of the joint appendix. I'm sorry, Your Honor. Ms. Petty, this is just a – this is an I'm-just-curious question. Why do you care? You have Goodyear, USA, which has consented to jurisdiction. Why does it make a difference to get these other companies in the North Carolina courts? Does North Carolina not make Goodyear, USA, substantively liable for this accident? Your Honor, North Carolina has particularly draconian requirements for piercing the corporate veil and alter egos, some of which Petitioners refer to. For example, the proximate causation of the wrong has to be related to the domination and control. And so ideally, it would be great if we could go back and simply deal with them and let them collect from their own. But what you're saying, then, is that North Carolina treats the parent and the subs very differently as a matter of substantive law. But you would want identical treatment as a matter of jurisdiction. Right. They have very – in most States, frankly, there's a lesser requirement for the exercise of jurisdiction merely allowing the suit to go forward than there is for actual imputation of liability or imposition of liability. And so North Carolina, I think, is a very good example of that. They have a fairly liberal requirement or state of the law that we cited in the Manley case, where general personal jurisdiction exists over a foreign corporation where it is controlled by or controls a local corporation. And that's the Wyatt Confectionery case that we cited in the chocolate – excuse me, the chocolate confectionery case cited in the Manley case. Sotomayor, I'm not sure that that answered. I understood you to be saying that, substantively, they might not be liable for the defect that caused the accident. Is that it? Yes. That – I mean, we – I think you have to understand that this case is in a very embryonic State. We have done no discovery in this case. This was an appeal, an interlocutory appeal from the denial of a motion to dismiss. And so there's been one deposition on a very limited jurisdictional issue. So we've not had an opportunity to develop that fax. We hope that we'll be able to develop those fax. But what we're faced with here is a situation where North Carolina would permit the exercise of jurisdiction under its well-established law on general personal jurisdiction, but when it comes to the imposition of liability for substantive purposes, that may be a much, much, much tougher sledding. And so in order to preserve the interests of our client, we've gone down this road as well. Ginsburg. Do you have any case law that supports your position, which I take it – you can correct me if I've got it wrong – that a subsidiary is subject to jurisdiction wherever the parent is so long as some products made by the subsidiary are shipped by the parent to the – to buyers in the forum State? No, Your Honor, because that's not our position here. Our position is, is that if you participate in this kind, not a general one, but in this kind of very tightly controlled system, distribution and supply system, then there is general jurisdiction in the forum over the foreign subsidiary that participates in this. But simply generally having a parent-subsidiary relationship and shipping goods into the forum, that's not what we're contending. And frankly, I don't think that that would be a situation in which general jurisdiction would apply. Ginsburg. I see nothing in the North Carolina court's opinion that explains that this is a – this is a corporation where we can obliterate the distinction between parent and sub. Your Honor, they do talk repeatedly about the existence of this highly integrated distribution system. I think it may be helpful to sort of flip it over and say, what would happen if we adopted the Petitioner's view that you ignore this system and all you look at is a few sales? I think that then you would end up with a situation that would be unfair to the State of North Carolina in terms of providing a forum for its residents. I mean, for example, if I may give a hypothetical, if you have a – not a manufacturing plant in Turkey, but let's say in China, that is producing massive amount of tires for importation into the United States, thousands of tires, in this same distribution system, based on their view that it has to be principal place of business, state of incorporation, and that mere sales are not – don't count, and it has the same jurisdiction system, then even that – that producer, and frankly, Goodyear is one of those producers, wouldn't be liable in North Carolina if the injury occurred someplace else. Ginsburg. There's a – you open your brief saying something to the effect of this case is about outsourcing, jobs in the U.S. going to subsidiary abroad, but then these subsidiaries are making tires, which on your own admission very rarely comes to the United States because they are designed specifically for vehicles in Asia and in Europe. And so I would think that Turkey would be the ideal location for such a place. I don't get your outsourcing pitch. Your Honor, our position here is that you will incentivize outsourcing if you agree with the Petitioner's view. With regard to the existing plants, 1,500 miles, which is the distance from Istanbul to Paris, is not exactly local production. But what we're talking about is, again, something like the example that I gave you of a production in China that you have, and it's based on the definition that we make of outsourcing, which are jobs that simply were in the United States. If a CEO is faced with a situation of locating a plant in North Carolina and subjecting the production of that plant, even if it's completely for export, and particularly if it's completely for export, to the jurisdiction, the general jurisdiction of the State courts, and can put that plant in China and send items around the world and not be subject to the jurisdiction of North Carolina, where do you think they're going to put that plant? Now, I don't disagree that they're going to put that plant in North Carolina. Scalia, I think you'd rather be sued in China? I think they would rather be sued in South Carolina. I wouldn't. I don't know why you would. Well, don't you think that's a question as to which we ought to have some sensitivity to the views of the United States expressed here by the Solicitor General? It certainly implicates foreign relations concerns. Your Honor, I think that the — well, let me answer this in two ways. The first way is policy considerations, either on our side or their side, are not due process issues. And the second point that I was going to make was the idea that the due process clause doesn't trump the exercise of jurisdiction over the Petitioner's here, based on policy. Instead, it has to be a showing of unfairness. I thought your argument about outsourcing sounded an awful lot like a policy argument to me. Well, it is a policy argument, but I think, Your Honor, that in all candor, I think we felt the need to respond to the policy arguments of not just the government, but also to the other side. I would say, let me, if I may complete the other thought, is that all of those considerations, as interesting as they are, as compelling as they may seem, you know, are not due process considerations. This Court really isn't empowered to restrict the jurisdiction of State courts based on assisting the United States in negotiating trade treaties. Instead, it has to be based on unfairness and showing of undue burden.  It's a matter of what power a sovereign has. I mean, it could be perfectly fair if you announce that you're going to assert jurisdiction over anybody who harms an American citizen anywhere in the world, and you give notice to every manufacturer in the world. That would be perfect, fair, but you have no power to do that under underaccepted notions of what a sovereign can do. And it would be tempered by the burdens test that is articulated in Asahi and elsewhere. But none of that impacts, you know, policy considerations such as trade negotiations, et cetera. I mean, the focus has been fairness and balance of interest. And here you have a manufacturer and you have Petitioners who voluntarily participated in an enterprise that operates in the State here. And we think that there's nothing unfair about when they agreed to deal with this, when they made money off of doing this, when they do this on an ongoing basis, there's nothing unfair about subjecting them to liability there. And particularly when you look at the Asahi factors, there's really no burden on the defendants here. One of the things that the Petitioners did not respond to in our brief is the notion that no matter what this Court decides, two of these Petitioners are going to be litigating in a foreign country anywhere. And the only thing that they have interjected as a burden is the presumptive burden of litigating in another country. They're going to be litigating in another country unless a court atomizes this case and says that the Petitioners have to litigate in four different States. So there's nothing to sort of suggest that there's any burden, nor therefore a basis for restricting the jurisdiction of the North Carolina State courts based on due process concerns. You know, by contrast, and the other thing that the Court has said is that the burden is the only issue. The issue is power, not just burden. That's correct, but the at least this Court has said since Penoria v. Neff that the And so it as I think the Court's correct that it may be perfectly fair to announce this to the world, but it's up to this Court to determine whether due process would restrict the exercise of that power, and it does it on an enunciated set of factors, none of which includes assisting the United States in negotiating trade treaties. The Petitioners, I think as we've suggested, have not really shown any sort of burden here, and they would be litigating with the same lawyers in the same lawyers in the same forum as their parent. And the Court has observed that even the kinds of litigation that would take place, the burdens on litigating in a foreign forum are much reduced, and that was in 1957, the year that I was born. The primary objections here are based on trade. I think it's interesting that the government has talked about those, but I don't think that's a basis for restricting jurisdiction. Ginsburg. Ginsburg. You said something about the two of them are subject to suit. You said this is a question of one lawsuit instead of four. Could you explain that? Well, for example, the parent and the three Petitioners all have principal places of business in four different countries, and we have general jurisdiction over the parent in the forum. We have the same lawyers that are representing all the parties in the forum, and we intend to go forward in the forum. Well, what about France? Well, in France, the Petitioners from Luxembourg and from Turkey, if they litigate in France, they're going to be litigating in a foreign country as well. And so our question is, why is it somehow more convenient to litigate in France than it is in the United States when you've got the same lawyers in the United States? Why is it more convenient? Is it a question that the claim arose there, and then, of course, it's just because the claim arose there, there would be some convenience factors, or the witnesses to the accident are there, whatever's left of the bus is there? Those are the forum nonconvenience issues that a court would consider. But I'm talking about the due process question in terms of investigating the actual burden on the Petitioners in litigating in the forum. And the only thing that they've really focused on is their preference for that forum, which is not a due process concern. Thank you. Roberts. Roberts. Roberts. Now, Mr. Feder, you have 5 minutes remaining. Thank you, Your Honor. The purported integrated distribution that Respondents are pointing to is the basis for ignoring the corporate separation here. Whatever else you could say about it and whether it's really any different from normal coordination, it only relates to the tiny fraction of Petitioners' business that involved tires going to the United States. So where they didn't normally market their products, and so, of course, everything that they sent to the United States was only when the U.S. affiliate reached out to get tires. That does not, under any theory of which I'm aware, even the most aggressive enterprise theory, that would not amount to a basis for merging the two companies and treating parent and sub as if they were one. As far as the hypothetical about China goes, I wanted to briefly address that. Of course, to the extent that there are a lot of tires sent in from China or anywhere else to North Carolina or any other State, there will be specific jurisdiction most likely in those cases. Our position here is simply that the fact that tires are coming in of which you may have specific jurisdiction is no basis to say that you can also bring in North Carolina what general jurisdiction would allow you to bring. Claims from workplace accidents in China, lease disputes, and whatever else. Scalia, what about special jurisdiction? Why don't we decide this on the basis of special jurisdiction? It's an accepted basis of jurisdiction, citizenship is. Countries can make it a crime, in fact, I think Italy does, to kill an Italian citizen abroad, and that person can be tried for that crime in Italy. So I assume that that is an acceptable basis of jurisdiction. So why don't we say that there is a specialized jurisdiction when a citizen of North Carolina is injured abroad so long as there is what is the word, the submission to the courts of North Carolina by having enough contact with North Carolina. The previous case, what's that crazy word? Availment. I meant to look that up. I'm not sure it's ever been used except in this courtroom. Why don't we decide it that way? Well, Your Honor, I don't think our law has a concept of special jurisdiction like that as consistent with the Due Process Clause, and I think that even, I won't purport to speak for the Respondents in the other case, but I think that they would probably agree that if the accident had happened to a New Jersey citizen in France, that that would not create, even under their stream of commerce theory, jurisdiction. Under our due process precedents, you need purposeful availment, and for general jurisdiction, of course, you need quite a bit more than that. And so while creative, I don't think it's quite fair. Ginsburg. There is a country that has what Justice Scalia, France, in the Civil Code, says that any French citizen can sue anybody on any claim in France, but we consider that an exorbitant jurisdictional rule. We do, Your Honor, and obviously we wouldn't recognize that under our Due Process Clause, and I think it points up some of the reasons why, at least at the margins, it is important to be able to negotiate treaties so that we can avoid having that sort of jurisdiction exercised against our citizens, just as within the European community, they have an agreement that it's not exercised within that community. If there are no further questions. Thank you, counsel. The case is submitted. The Honorable Court is now adjourned until tomorrow at 10 o'clock.